No. 19-2164

## In the
# United States Court of Appeals
## For the Seventh Circuit

Bradley Ledure,

*Plaintiff-Appellant,*

v.

Union Pacific Railroad Company,

*Defendant-Appellee.*

On Appeal from the United States District Court for the Southern District of Illinois
Case No. 3:17-cv-007-JPG-GCS, Hon. J. Phil Gilbert, Judge Presiding

### APPELLEE'S BRIEF

J. Timothy Eaton
Jonathan B. Amarilio
TAFT STETTINIUS & HOLLISTER LLP
111 E. Wacker Drive, Suite 2800
Chicago, Illinois 60601
Tel.: 312.527.4000
teaton@taftlaw.com
jamarilio@taftlaw.com

Thomas E. Jones
Thompson Coburn LLP
525 W. Main Street, Suite 300
Belleville, Illinois 62220
Tel.: 618.227.4700
tjones@thompsoncoburn.com

*Attorneys for Defendant-Appellee*

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 19-2164

Short Caption: Bradley Ledure v. Union Pacific Railroad Company

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[  ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Union Pacific Railroad Company

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Taft Stettinius & Hollister LLP

Thompson Coburn LLP

(3)  If the party or amicus is a corporation:

i)  Identify all its parent corporations, if any; and

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

Attorney's Signature:  s/  J. Timothy Eaton                    Date: November 20, 2019

Attorney's Printed Name:  J. Timothy Eaton

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes**  X    **No** _____

Address:  Taft Stettinius & Hollister LLP

111 East Wacker Drive, Suite 2800, Chicago, IL  60601

Phone Number:  (312) 527-4000                    Fax Number:  (312) 966-8519

E-Mail Address:  teaton@taftlaw.com

rev. 01/15 GA

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 19-2164

Short Caption: Bradley Ledure v. Union Pacific Railroad Company

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[   ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

    Union Pacific Railroad Company

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Taft Stettinius & Hollister LLP

    Thompson Coburn LLP

(3)  If the party or amicus is a corporation:

    i)  Identify all its parent corporations, if any; and

    ii)  list any publicly held company that owns 10% or more of the party's or amicus' stock:

Attorney's Signature: s/ Jonathan B. Amarilio      Date: November 20, 2019

Attorney's Printed Name: Jonathan B. Amarilio

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** _____    **No** ✕

Address: Taft Stettinius & Hollister LLP

    111 East Wacker Drive, Suite 2800, Chicago, IL  60601

Phone Number: (312) 527-4000      Fax Number: (312) 966-8536

E-Mail Address: jamarilio@taftlaw.com

rev. 01/15 GA

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: __19-2164__

Short Caption: __Bradley Ledure v. Union Pacific Railroad Company__

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[   ]     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Union Pacific Railroad Company

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Thompson Coburn LLP

Taft Stettinius & Hollister LLP

(3)  If the party or amicus is a corporation:

i)  Identify all its parent corporations, if any; and

ii)  list any publicly held company that owns 10% or more of the party's or amicus' stock:

Attorney's Signature: __/s/ Thomas E. Jones__     Date: __November 20, 2019__

Attorney's Printed Name: __Thomas E. Jones__

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).     Yes _____     No __✕__

Address: __Thompson Coburn LLP__
__525 W. Main Street, Suite 300, Belleville, Illinois  62220__

Phone Number: __(618) 227-4700__     Fax Number: _____

E-Mail Address: __tjones@thompsoncoburn.com__

rev. 01/15 GA

# TABLE OF CONTENTS

Page

JURISDICTIONAL STATEMENT ................................................................. 1

STATEMENT OF THE CASE ..................................................................... 1

I.      Factual background ....................................................................... 1

SUMMARY OF THE ARGUMENT .......................................................... 10

ARGUMENT ........................................................................................... 11

I.      Standard of Review ..................................................................... 11

II.     The district court correctly entered summary judgment for
        Union Pacific on Plaintiff's LIA claim because UP 5683 was
        not "in use" at the time of the alleged accident ......................... 11

        A.      The LIA's role in the FELA's framework ........................... 11

        B.      The district court correctly concluded that UP 5683
                was not "in use" under the LIA because it was not
                operating and was not about to be operated at the time
                of Plaintiff's alleged accident ........................................... 14

                1.      This Court's jurisprudence on what constitutes
                        "use" under the LIA supports the district court's
                        judgment. ............................................................... 15

                2.      Decisions from other circuit courts addressing
                        what constitutes "use" also support the district
                        court's judgment. .................................................... 20

                3.      Plaintiff's arguments for why UP 5683 was
                        "in use" at the time of his alleged accident
                        fail for several reasons ........................................... 23

                        i.      Plaintiff's argument that the LIA should
                                apply at all times except when a locomotive
                                in undergoing repairs in a place of repair
                                ignores Congress's intent for the statute
                                to ensure the safe operation of active
                                locomotives .................................................. 24

|     | ii. | Authority discussing locomotives already performing their function and operating in commerce is inapplicable here............................ 26 |
|     | iii. | The readiness of a locomotive to depart a rail yard is directly relevant to whether it is "in use."................................................ 30 |

III.  The district court correctly entered summary judgment for Union Pacific on Plaintiff's FELA claim because there is no evidence that his alleged accident was foreseeable. ............... 32

   A.   Plaintiff presented no evidence from which a jury could reasonably conclude that Union Pacific had actual notice of the oily substance that allegedly caused Plaintiff's injury................................................................................ 33

   B.   Plaintiff presented no evidence from which a jury could reasonably conclude that Union Pacific had constructive notice of the oily substance that allegedly caused Plaintiff's injury.................................................................... 40

   C.   Plaintiff presented no evidence from which a jury could reasonably conclude that the tread on UP 5683's walkway was dangerously worn at the time of his alleged accident, much less evidence that Union Pacific had actual or constructive notice of dangerously worn tread ..................................... 44

   D.   Plaintiff's allegations of LIA regulatory violations fail with his FELA claim. .......................................................... 47

CONCLUSION................................................................................ 48

## TABLE OF AUTHORITIES

*Angell v. Chesapeake and Ohio Railway Company*, 618 F.2d
260 (4th Cir. 1980) ........................................................................ 20-21, 30, 31

*Baltimore & Ohio S.W.R. Co. v. Carroll,* 280 U.S. 491 (1930) ................... 12

*Baltimore & Ohio R.R. Co. v. Groeger,* 266 U.S. 521 (1925) ...................... 13

*Brady v. Terminal Railroad Association of St. Louis*, 303 U.S. 10
(1938) ................................................................................................... 27-28, 29

*Consol. Rail Corp. v. Gotchall*, 512 U.S. 532 (1994) .................................. 12

*Coffey v. N.E. Ill. Reg'l Commuter R.R. Corp.*,
479 F.3d 472 (7th Cir. 2007) ................................................................. 12, 13

*CSX v. Transp., Inc. v. McBride*, 564 U.S. 685 (2011) ............................... 33

*Deans v. CSX Transp., Inc.*, 152 F.3d 326 (4th Cir. 1998) ........................ 21, 31-32, 43

*Deutsche v. Burlington N. R.R., Co.,* 983 F.2d 741 (7th Cir. 1992) .................... 12, 46

*Doty v. Ill. Cent. R.R. Co.*, 162 F.3d 460 (7th Cir. 1998) ........................... 48

*Elgin, Joliet & E. Ry. Co. v. Gibson*, 355 U.S. 897, 78 S.Ct. 270 (1957) ................... 39

*Estes v. Southern Pacific Transportation Company*,
598 F.2d 1195 (10th Cir. 1979) ................................................................... 22

*Ferguson v. Moore-McCormack Lines, Inc.*, 352 U.S. 521 (1957) ......................... 38-39

*Fulk v. Ill. Cent. R.R. Co.*, 22 F.3d 120 (7th Cir. 1994) .............................. 48

*Gallick v. Baltimore & Ohio Railroad Company*, 372 U.S.108 (1963) ................. 35-36

*Gibson v. Elgin, Joliet & E. Ry. Co.,* 246 F.2d 834 (7th Cir. 1957) ..................... 38-39

*Glow v. Union Pac. R.R. Co.,* 652 F. Supp. 2d 11235 (E.D. Cal. 2009) ...................... 13

*Harbin v. Burlington N. R.R. Co.,* 921 F.2d 129 (7th Cir. 1990) ............................... 12

*Holbrook v. Norfolk Southern Railway Company*,
414 F.3d 739 (7th Cir. 2005) .......................................... 8, 11, 12, 33-37, 39, 40, 42-44

*Holfester v. Long Island Railroad Company*, 360 F.2d
369 (2d Cir. 1966) ............................................................................ 27-28, 29

*Horibin v. Providence & Worcester R.R. Co.,* 352 F. Supp. 2d 116
(D. Mass. 2005) ................................................................... 24-25

*Jones v. Hanley Dawson Cadillac Co.,* 848 F.2d 803 (7th Cir. 1988) ...................... 19

*Kurns v. Chesterton Inc.,* 620 F.3d 392 (3d Cir. 2010) ............................................... 13

*Kurns v. R.R. Friction Prod. Corp.,* 565 U.S. 625 (2012) ........................................... 46

*Lilly v. v. Grand Trunk W. R.R. Co.,* 317 U.S. 481 (1943) ......................................... 12

*Lyle v. Atchison, T. & S.F. Railway Company,* 177 F.2d 221
(7th Cir. 1949) .............................................................................................*passim*

*Lynch v. N.E. Reg'l Commuter R.R. Corp.,* 700 F.3d 906
(7th Cir. 2012) ................................................................................................. 38, 39

*Moore v. Chesapeake & O. Ry. Co.,* 340 U.S. 573(1951) ..................................... 10, 39

*McGinn v. Burlington N. R.R. Co.* 102 F.3d 295 (7th Cir. 1996) ........................ 12, 32

*McGrath v. Consol. Rail Corp.,* 136 F.3d 83 (1st Cir. 1998) .......................... 11, 14, 21

*Napier v. Atlantic Coast Line R. Co. Chicago & N.W. R. Co.,*
272 U.S. 605 (1926) ........................................................................................... 46

*Peretz v. Sims,* 662 F.3d 478 (7th Cir. 2011) ............................................................ 11

*Phillips v. CSX Transp., Inc.,* 190 F.3d 285 (4th Cir. 1999) .............................. 29, 30

*Robb v. Burlington Northern & Santa Fe Ry. Co.,* 100 F. Supp. 2d 867
(N.D. Ill. 2000) ................................................................................................. 28-29

*Steer v. Burlington N., Inc.,* 720 F.2d 975 (8th Cir. 1983) ....................................... 28

*Southern Railway Company v. Bryan,* 375 F.2d 155 (5th Cir. 1967) ................. 29-30

*Swartz v. N.Y. Cent. R.R. Co.,* 323 F.2d 713 (7th Cir. 1963) ................................... 39

*Texas & Pacific Railway Company v. Rigsby,* 241 U.S. 33 (1916) ...................... 29-30

*Tisneros v. Chicago & Northwest Railway Company,* 197 F.2d
466 (7th Cir. 1952) ....................................................................................... 17, 25

*Trinidad v. Southern Pacific Transportation Company,* 949
F.2d 187 (5th Cir. 1991) ................................................................................. 22

iv

*Underhill v. CSX Transp., Inc.,* 1:05-cv-196-TS, 2006 WL 1128619
(N.D. Ind. Apr. 24, 2006) ............................................................. 29

*Urie v. Thompson*, 337 U.S. 163 (1949) .................................. 11, 13, 19, 26

*Van Gorder v. Grand Trunk W. R.R., Inc.* 509 F.3d 265
(6th Cir. 2007) ............................................................................ 12

*Ward v. Soo Line R.R. Co.,* 901 F.3d 868 (7th Cir. 2018) .................... 13, 19

*Williams v. Nat'l R.R. Passenger Corp.,* 161 F.3d 1059
(7th Cir. 1998) ............................................................................ 32

*Wright v. Arkansas & Missouri Railroad Company*, 574 F.3d 612
(8th Cir. 2009) ............................................................................ 20

*Zbaraz v. Madigan*, 572 F.3d 370 (7th Cir. 2009) ........................... 26

## OTHER STATUTES

45 U.S.C. § 22 ............................................................................ 15

49 U.S.C. § 51 ............................................................................ 6

49 U.S.C. § 20701 ....................................................................... 6, 14

49 U.S.C. § 20301 ....................................................................... 22, 28

49 U.S.C. § 20302 ....................................................................... 28

49 C.F.R. § 229.21 ...................................................................... 5, 40

## JURISDICTIONAL STATEMENT

Plaintiff's jurisdictional statement is complete and correct.

## STATEMENT OF THE CASE

### I.   Factual background

Plaintiff was a Union Pacific locomotive engineer, working primarily out of its Salem, Illinois rail yard. Dkt. 49-1 at 9-10. On August 12, 2016, Plaintiff arrived for work at the Salem yard at 2:10 a.m. Dkt. 49-1 at 21. His first job was to assemble a train for a run, and the initial step in that process was to identify or "tag" the locomotives in the yard that would be used to power and pull that train. *Id.* at 21-22. Tagging involves hanging signs in locomotive cabs to identify whether they are running and being used to power a train. Dkt. 49-1 at 20-22, 24.

Three locomotives were parked, coupled together, and sitting on the back track of the rail yard, which is connected to but separate from the main line on which trains in commercial operation run. *Id.* at 23; Dkt. 55-2 at 4. Plaintiff says in his statement of facts that the back track is "an *active track*" (Pl.'s Br. 7 (emphasis original)), implying it is used in commerce as part of the main line and selectively quoting from the deposition of Union Pacific conductor Steve Holtz to that end, but Holtz testified that the back track is "active" in that "[i]t's mostly used for trains that do work at [the] Salem" yard (Dkt. 55-2 at 4) and is thus not part of the main line.

Of the three locomotives parked on the Salem back track, the first two belonged to Norfolk Southern Railway and the third—UP 5683—belonged to Union Pacific. Dkt. 49-1 at 22. UP 5683 was being transported to Union Pacific's Pine Bluff,

Arkansas yard for routine inspection and maintenance. Dkt. 49-5 at 10. Only the lead locomotive was needed to power Plaintiff's train and he began tagging the engines accordingly. Dkt. 49-1 at 22-23. The other two locomotives, including UP 5683, would be "running dead" (*i.e.*, unpowered and inoperative) in the train. *Id.* at 22. After tagging the locomotives, Plaintiff was to perform several switching operations necessary to assemble the train because, as he put it, "the train was not set up and ready to go." *Id.*

Plaintiff tagged the first locomotive for operation, the second locomotive for non-operation, and was proceeding to tag UP 5683 for non-operation as well when his alleged accident occurred. Specifically, Plaintiff was walking along the exterior walkway of UP 5683 on his way to its cab when he allegedly slipped and fell. *Id.* at 24-25. No one witnessed Plaintiff's alleged fall. Plaintiff did not see anything on the walkway before or immediately after his fall that would cause him to slip. *Id.* at 28-29, 27-28. Plaintiff immediately picked himself up off the walkway and, as planned, proceeded to tag UP 5683 for non-operation because, in his words, he "wasn't operating it" that day and "[i]t wasn't in [his] consist." *Id.* at 28-29, 47.[1]

After tagging UP 5683 for non-operation, Plaintiff returned to the walkway where he allegedly fell and bent down with his flashlight to examine the floor, where he "notice[d] that there was a little something there." *Id.* at 29-30. He then moved on performed the switching operations necessary to assemble the train, later reporting to his supervisor that he slipped on "some kind of film of grease or oil or something

---

[1]    A consist is a sequence of connected locomotives.

slick," refusing an offer of medical treatment, and going home after dawn rather than taking the train to its next destination. Dkt. 49-1 at 49-50, 51; Dkt. 50-7; 54-2 at 3. Plaintiff testified that he "had no idea" what the substance on the walkway was, saying that it might have been "grease or oil or whatever" and that it was "slick" and "greasy like" to the touch. Dkt. 49-1 at 22-23. When UP 5683 was inspected in the hours following Plaintiff's reported fall, it was noted that a "small amount of oil" was wiped up during the inspection from the same general location of Plaintiff's reported fall. Dkt. 49-5.

Plaintiff offered mixed testimony at his deposition as to whether he was inspecting UP 5683 as he prepared the train for departure. At some points in his testimony Plaintiff denied that he was performing an inspection, and at other points he acknowledged that he was. Dkt. 49-1 at 23, 27-28. Regardless, Plaintiff agreed that he was required to look for "any unsafe conditions" as he walked along the locomotive and to report any unsafe conditions if found, adding that prior to his fall he "did not see anything" leaking from the engine compartments or parts in the vicinity of UP 5683, nor did he see spilt oil, grease, or other foreign substances anywhere else on the locomotive; there was only this one, "small" and "very isolated" spot of apparent oil. Dkt. 49-1 at 23, 45; Dkt. 54-2 at 4.

No other oil spots were found on the locomotive when it was subsequently inspected. Dkt. 54-2 at 3. Union Pacific Senior Specialist Thomas Kennedy later testified that there were no components in the architecture of UP 5683 in the vicinity of Plaintiff's alleged fall that could have leaked and left a slippery substance on the

walkway. Dkt. 49-5 at 11. The origin of the oily substance was and remains unknown, although the post-accident mechanical inspection performed after Plaintiff's alleged accident revealed no defects or leaks. Dkt. 49-6.

UP 5683 had returned to Union Pacific's possession shortly before Plaintiff's alleged accident. The locomotive had been loaned to Norfolk Southern for over a month, was returned to Union Pacific in Chicago, Illinois, at 5 p.m. on August 11, 2016, and was then taken overnight to Salem, arriving before Plaintiff's shift began on August 12, 2016. Dkt. 49-5 at 5, 6, 10; Dkt. 87 at 4.

Plaintiff says in his statement of facts and throughout his brief that "UP5683 was still powered on from its use in transporting the train from Chicago" (Pl.'s Br. 4), but that is unsupported in the record. Plaintiff testified that he believed UP 5683's engine was on and he shut it down when tagging it dead (Dkt. 49-1 at 22), but that does not mean the locomotive was used to transport a train from Chicago.

Plaintiff also says in his statement of facts that "[n]otably, the record documenting the mandatory daily inspections of UP 5683 shows that it *had not* been inspected by [Norfolk Southern] from August 8 through 11, 2016," and that Union Pacific "admits" that it should have been inspected before Plaintiff was assigned to tag the engine. Pl.'s Br. 6-7 (emphasis original). Union Pacific made no such admission.[2] Federal regulations require that railroads inspect locomotives once each

---

[2]     Plaintiff cites the district court's docket for this supposed admission (A28), and the Kennedy's testimony, who merely confirmed that the locomotive did not undergo service or maintenance in the hours between its return and Plaintiff's accident. Dkts. 49-5 at 7, 10; 55-1 at 7, 10.

day they are used. 49 C.F.R. § 229.21. Union Pacific had not inspected UP 5683 by the time of Plaintiff's alleged accident as it had not been in its possession for a full day and it was being transported for that purpose. Plaintiff has no evidence the locomotive was "used"—and thus required inspection under federal regulations—shortly before his accident.

Referencing his theory that his alleged accident was caused in part by insufficient footing, Plaintiff also says in his statement of facts that he "observed that the non-slip studs on the tread of UP 5683's walkway were significantly worn down and did not provide a secure footing" and that "[p]hotographs of the walkway confirmed [his] observations." Pl.'s Br. 7. This too is unsupported by the record. Plaintiff's own post-accident report makes no mention of worn tread and there is no evidence that he complained of worn tread prior to filing this lawsuit. Dkt. 50-7. In fact, Plaintiff did not make an allegation of worn walkway tread until he filed his first amended complaint in this lawsuit, 18 months after his alleged accident. *Compare* Dkt. 1 at 2 *with* Dkt. 22 at 2. And Plaintiff neglects to inform the Court that the photographs on which he relies to show what he says is worn tread on UP 5683 at the time of his alleged accident were taken almost two years after his accident. Dkt. 87 at 72.

Rather than provide evidence that the tread was worn on the day of his alleged accident or that the stud tread installed on UP 5683 was somehow defective, Plaintiff opined at his deposition that a diamond pattern tread pattern would have provided

5

better traction than the stud pattern on the locomotive. Dkt. 49-1 at 29-30. Plaintiff never offered any expert or other evidence supporting his opinion on this issue.

Although not relevant to the issues on appeal, Plaintiff discusses in his brief the injuries that he says resulted from his alleged accident, emphasizing that he is "permanently disabled from returning to railroad work." Pl.'s Br. 6. This is not the first time Plaintiff has made that claim in seeking damages from a railroad. Plaintiff previously worked for the BNSF Railway Company as a conductor and, following another claimed and similar workplace injury, left that position after settling a lawsuit against the railroad for $850,000, and after affirming to BNSF that he was permanently disabled from all future railroad work. Dkt. 49-1 at 4; Dkt. 87 at 53.

## II.    Procedural history

Plaintiff filed a two-count complaint against Union Pacific. Dkt. 1. In his first amended complaint, Plaintiff brings claims under the Federal Employers Liability Act ("FELA"), 49 U.S.C. § 51 *et seq.*, and the Locomotive Inspection Act ("LIA"), 49 U.S.C. § 20701 *et seq.* Dkt. 22. Plaintiff's FELA claim is based on nine—mostly redundant—alleged breaches of the railroad's duty to maintain a safe workplace, including breaches of the LIA and several regulations promulgated thereunder. Dkt. 22 at 2-3. As discussed below, Plaintiff brings his LIA claim and incorporates alleged LIA violations into his FELA claim because establishing an LIA violation would subject Union Pacific to a negligence *per se* standard, rather than the FELA's modified negligence standard. Plaintiff's LIA claim thus largely resembles his FELA

claim, alleging that his injuries were caused by six violations of the LIA and regulations promulgated thereunder. Dkt. 22 at 4-5.

Union Pacific moved for summary judgment on Plaintiff's claims, arguing that (1) the LIA has no application in this case because UP 5683 was not "in use" on its line at the time of Plaintiff's injury, a threshold legal issue governing the applicability of that statute; (2) Plaintiff's claimed regulatory violations fell with his LIA claim, on which they were premised; (3) Plaintiff could not meet his FELA burden by establishing his injury was reasonably foreseeable; and (4) Plaintiff's claims concerning the tread on UP 5683 were based on unsupported speculation and precluded as a matter of law because they related to the locomotive's design. Dkts. 47-49. Plaintiff then filed a cross-motion for summary judgment on the same "in use" issue raised in Union Pacific's motion. Dkt. 50.

After considering the parties' many briefs on these issues and holding oral argument thereon, the district court entered summary judgment for Union Pacific on both of Plaintiff's claims. Addressing first Plaintiff's LIA claim, the court performed an extensive review of the law, observing that other district courts' decisions on what constitutes "use" under the LIA are irreconcilably disparate, and thus elected to concentrate its analysis on federal circuit court authority. Dkt. 85 at 6-10. The district court noted that although the nation's federal reviewing courts employ different approaches when deciding what constitutes "use" under the LIA, it should apply the binding standard set down by this Court in *Lyle v. Atchison, T. & S.F. Railway Company*, 177 F.2d 221 (7th Cir. 1949), *cert denied* 339 U.S. 913 (1950).

7

Applying *Lyle*, the district court concluded that UP 5683 was not "in use" under the LIA at the time of Plaintiff's alleged accident because: it was stationary, it was parked on a back track of depot yard, it had not yet been inspected or tagged, and it had not yet been assembled into a train for use in interstate commerce, all of which weighed against a finding that the locomotive was being "used" under this Court's jurisprudence. *Id.* The district court found the same outcome would also result if it applied other circuit courts' LIA "use" analyses. *Id.* at 9. The court further found that Plaintiff's claims based on the alleged violation of regulations promulgated under the LIA, including his tread claim, had no application because the LIA did not apply. *Id.*

Turning to Plaintiff's FELA claim, the district court agreed with Union Pacific that his alleged accident was not reasonably foreseeable. Relying in large part on this Court's decision in *Holbrook v. Norfolk Southern Railway Company*, 414 F.3d. 739 (7th Cir. 2005), the facts of which the district court said closely resembled those here, the court found that: (1) there was no evidence that Union Pacific had actual notice of the oily substance on the locomotive walkway, and (2) Plaintiff could not rely on a constructive notice theory of foreseeability because he had no evidence supporting the conclusion that the substance was actually on the walkway before he stepped on it, there were no nearby locomotive components from which the substance could have leaked, there was no evidence that the substance came from the locomotive, and there were "'a myriad of possible ways it could have gotten onto' the walkway." Dkt. 85 at 12 (quoting *Holbrook*, 414 F.3d. at 475). There was thus no evidence that Union Pacific caused the oily substance to be on the locomotive walkway or that an earlier

inspection would have found and removed it before Plaintiff's alleged accident. *Id.* The district court consequently entered summary judgment for Union Pacific on Plaintiff's LIA and FELA claims.

Plaintiff moved for reconsideration of the district court's judgment under Federal Rule of Civil Procedure 59(e), arguing along lines similar to those made here. Dkt. 88. The district court explained that in arguing for reconsideration Plaintiff "misunderstands or misrepresents both this Court's prior order and the binding caselaw that it relied on," and the court felt obliged to address some of those misrepresentations "in order to ensure that this Court's order is not warped in any potential appellate briefs." Dkt. 94 at 2.

The district court explained that, contrary to Plaintiff's assertions, it did not ignore the mostly unpublished district court decisions upon which Plaintiff relied in his summary judgment briefing, but rather found those non-precedential cases unhelpful because they were inconsistent in their analyses and thus provided "very little guidance" on what constitutes "use" under the LIA. *Id.* The court further said that Plaintiff mischaracterized its analysis of the case law, mischaracterized its finding that the LIA regulations were irrelevant because that statute did not apply, and did not provide "an honest depiction" of the evidence in his briefing. *Id.* at 2-5.

The district court noted in this regard that one of Plaintiff's factual misrepresentations "deserve[d] particular attention," specifically that the court ignored his argument that his alleged accident was foreseeable because oil was previously discovered on UP 5368, supporting a reasonable inference that there was

9

a nearby source of leaking oil or that Union Pacific had insufficient maintenance practices. *Id.* at 5. The court observed that in making that argument in his Rule 59(e) motion, Plaintiff "fail[ed] to mention that this prior discovery [of oil on the locomotive] occurred *three years* before the incident in this case," an omission he also made in his summary judgment briefing. *Id.* (emphasis original). The district court concluded that Plaintiff's FELA claim was ultimately based on speculation, which "'cannot supply the place of proof'" and declined to reconsider its judgment. *Id.* (quoting *Moore v. Chesapeake & O. Ry. Co.*, 340 U.S. 573, 577 (1951)). This appeal followed.

## SUMMARY OF THE ARGUMENT

The locomotive on which Plaintiff's alleged accident occurred was not "in use" under the LIA. While district court authority addressing what constitutes "use" of a locomotive is discordant, circuit court authority supports the conclusion that a locomotive is not "in use" under the LIA unless the locomotive is being operated or is at least ready for operation, as opposed to a locomotive that is not operating, is not going to be operated, or requires preparation for future operation. This distinction controlled the Court's analysis of the issue in *Lyle*, 177 F.2d 221 (7th Cir. 1949), and should control here. Because UP 5683 was being tagged for non-operation when Plaintiff was allegedly injured, it was not "in use," the LIA is inapplicable, and the district court correctly entered summary judgment for Union Pacific on Plaintiff's LIA claim.

The district court also correctly entered summary judgment for Union Pacific on Plaintiff's FELA claim because he failed to produce any evidence that his alleged

10

accident was foreseeable, an essential element of an FELA negligence claim. *Holbrook*, 414 F.3d. at 742. Plaintiff's arguments that Union Pacific had actual and constructive notice of the alleged hazard (*i.e.*, the oily substance) fail because he produced no evidence supporting the conclusion that Union Pacific knew of the hazard, no evidence identifying the source of that hazard, no evidence placing himself within the temporal or physical vicinity of the source of the hazard, and no evidence the hazard would have been discovered by Union Pacific in the exercise of due care. His arguments are rather based on speculation, conjecture, and mischaracterizations of the factual record, which are insufficient to support an FELA claim.

## ARGUMENT

### I.    Standard of review.

This Court reviews *de novo* a district court's grant of summary judgment. *Peretz v. Sims*, 662 F.3d 478, 480 (7th Cir. 2011). Whether a locomotive was "in use" under the LIA is similarly reviewed *de novo*, as it presents a question of law. *McGrath v. Consol. Rail Corp.*, 136 F.3d 838, 842 (1st Cir. 1998).

### II.   The district court correctly entered summary judgment for Union Pacific on Plaintiff's LIA claim because UP 5683 was not "in use" at the time of the alleged accident.

#### A.    The LIA's role in the FELA's framework.

The LIA acts as a supplement to the FELA. *Urie v. Thompson*, 337 U.S. 163, 188 (1949). It is thus helpful to understand how the LIA fits within the FELA's general framework. The purpose of the FELA is to provide a remedy to railroad workers for injuries resulting from the negligence of railroads. *Consol. Rail Corp. v.*

*Gotchall*, 512 U.S. 532, 542 (1994). The statute "'imposes on railroads a general duty to provide a safe workplace'" (*Holbrook*, 414 F.3d at 741 (quoting *McGinn v. Burlington N. R.R. Co.*, 102 F.3d 295, 300 (7th Cir. 1996))), although "this does not mean that a railroad has the duty to eliminate all workplace dangers, but only the 'duty of exercising reasonable care to that end'" (*Van Gorder v. Grand Trunk W. R.R., Inc.*, 509 F.3d 265, 269 (6th Cir. 2007) (quoting *Baltimore & Ohio S.W.R. Co. v. Carroll*, 280 U.S. 491, 496 (1930))). The FELA therefore is not a workers' compensation statute and it does not make railroads the insurer of their employees' safety. *Gotchall*, 512 U.S. at 543. The basis of the railroad's liability under the FELA is its negligence, not the fact that an injury occurred. *Id.*

Although this Court has previously said that the quantum of evidence required for a plaintiff to get his or her FELA claim before a jury is slight, close examination of that authority reveals that in doing so the Court was discussing only the FELA's comparatively liberal causation standard. *See, e.g.*, *Deutsche v. Burlington N. R.R., Co.*, 983 F.2d 741, 742 (7th Cir. 1992) (quoting *Harbin v. Burlington N. R.R. Co.*, 921 F.2d 129, 131 (7th Cir. 1990)). "The essential point" is that the relaxed standard of proof under the FELA applies only to the element of causation. *Coffey v. N.E. Ill. Reg'l Commuter R.R. Corp.*, 479 F.3d 472, 477 (7th Cir. 2007); *accord Van Gorder*, 509 F.3d at 269.

The "prime purpose" of the LIA is "the protection of employees and others by requiring the safe use of [locomotive] equipment." *Lilly v. Grand Trunk W. R.R. Co.*, 317 U.S. 481, 486 (1943). The LIA accomplishes this goal by setting "national,

uniform standards of minimum safety requirements for trains, train parts, and related machinery." *Glow v. Union Pac. R.R. Co.*, 652 F. Supp. 2d 1135, 1145 (E.D. Cal. 2009); *accord Coffey*, 479 F.3d at 477. In "requiring that the boiler and, not long after, that the entire locomotive, be maintained 'in proper condition and safe to operate,' Congress by its own statement was attempting to insure that such equipment 'be employed in … *active service* … without unnecessary peril to life or limb." *Urie*, 337 U.S. at 190 (emphasis added).[3]

To that end, "[t]he LIA 'imposes upon the carrier a higher degree of duty than theretofore existed' at common law, requiring the railroad to ensure locomotive equipment is 'in proper condition and safe *to operate.*'" *Ward v. Soo Line R.R. Co.*, 901 F.3d 868, 873 (7th Cir. 2018) (quoting *Baltimore & Ohio R.R. Co. v. Groeger*, 266 U.S. 521, 523, 527 (1925)) (emphasis added). The LIA does not, however, create a private right of action. *Ward*, 901 F.3d at 876. It "merely establishes a safety standard, [and] the failure to comply with that standard is negligence per se under the FELA." *Coffey*, 479 F.3d at 477. A plaintiff who can establish an LIA violation is thus "relieved of the burden of proving negligence," although "[h]e still has to prove a causal relation between a violation and the injury for which he is suing." *Id.*

---

[3]    The court's reference to boilers recalls that the LIA was originally known as the Boiler Inspection Act, or BIA, and is referred as such in much of the older case law on this issue. *Kurns v. A.W. Chesterton Inc.*, 620 F.3d 392, 398 n.3 (3d Cir. 2010).

**B.    The district court correctly concluded that UP 5683 was not "in use" under the LIA because it was not operating and was not about to be operated at the time of Plaintiff's alleged accident.**

Before strict liability may be imposed on a railroad for violation of an LIA safety standard, the plaintiff must establish that the locomotive at issue was "in use" at the time of his or her accident. *Lyle*, 177 F.2d at 222. This threshold requirement is found in the statute, which states that: "[a] railroad carrier may *use or allow to be used* a locomotive or tender on its railroad line only when the locomotive or tender and its parts and appurtenances … are in proper condition and safe to operate without unnecessary danger of personal injury."" 49 U.S.C. § 20701 (emphasis added). "In other words, when a locomotive or car is in 'use on the line,' the mandatory duty of the carrier attaches and when the car or engine is not so in use then the duty under the express provision of the statute does not exist." *Lyle*, 177 F.2d at 222. Whether a locomotive is "in use" under the LIA is a question of law for a court to decide. *McGrath*, 136 F.3d at 842. Although Plaintiff attempts to portray the "in use" requirement as an exception to the imposition of to strict liability, it is rather an important precondition to strict liability and a departure from the FELA's negligence standard.

The problem is that the LIA does not define what it means for a locomotive to be "in use … on its railroad line." 49 U.S.C. § 20701. As the district court stated, "there is no clear-cut test to determine when a locomotive is 'in use'" and decisions from federal courts seem to differ on the issue. Dkt. 85 at 7. Plaintiff argues otherwise throughout his brief, conceding that the analysis is fact dependent, but telling the

Court that the law on this issue is clear and the district court's error is plain, citing only those cases in support of his position and none of the cases that run against it. This is misleading. The law on what constitutes "use" under the LIA is somewhat inconsistent on its face. As the district court aptly observed, for every district court case Plaintiff cites in support of his argument that UP 5683 was "in use" at the time of his accident, there is another district court case that stands for the opposite proposition. Dkt. 85 at 7.

However, this does not mean that federal circuit court jurisprudence on this issue is irreconcilable. For all the apparent variance in LIA jurisprudence, when viewed in the aggregate a vivid line appears to emerge at the circuit court level between locomotives that are actually being operated or are at least immediately ready for operation, and locomotives that are not going to be operated or require some degree of additional preparation for future operation. This apparent distinction was recognized and applied by this Court seven decades ago in *Lyle* and remains sound law today. And because the district court's judgment fits comfortably within this framework, it should be affirmed.

### 1.     This Court's jurisprudence on what constitutes "use" under the LIA supports the district court's judgment.

*Lyle* is the leading decision from this circuit on the meaning of "use" under the LIA. The plaintiff in *Lyle* was a hostler's helper who slipped and fell from a locomotive step ladder while preparing the engine for departure by replenishing its sand, water and fuel supplies. *Lyle*, 177 F.2d at 221-22. The plaintiff brought a claim against the railroad under the LIA's predecessor, the BIA, alleging—as Plaintiff does here—that

his employer violated the statute's safety rules by allowing "oil, grease and foreign substances" to remain on the ladder. *Id.* at 221.

In considering the statute's applicability and examining whether at the time of injury the locomotive was "in use" or being "used on its line," this Court in *Lyle* considered a number of facts, including: the nature of the plaintiff's duties, particularly that he was "doing anything … the engine needed to have done in order to put it in condition for use…. [s]o that it would be in readiness for future use on another run"; the locomotive had ended its daily run and "its use in commerce had come to an end"; the engine was taken to a maintenance area of the yard for servicing; the plaintiff was alone on the locomotive; the locomotive was sitting idle at the moment of injury, rather than moving on the main line; it was unclear whether the locomotive was used after being put in readiness; and it was the plaintiff's duty to remove and report any observed oil, grease or other foreign matter improperly on the locomotive. *Id.* at 222.

The *Lyle* court found after considering these facts (in what arguably amounted to a totality of the evidence analysis) that "[i]t is opposed to reality to say that under such circumstances the locomotive was in use so that the mandatory duty imposed by the [LIA] then applied." *Id.* at 223. "To service an engine while it is out of use, *to put it in readiness for use*, is the antithesis of using it." *Id.* (emphasis added). Put differently, because the surrounding facts demonstrated that the locomotive was being readied for operation, it was not "in use," even though it was unclear whether the locomotive was subsequently returned to use. The court concluded that "[t]o apply

the mandatory liability in favor of one who puts an engine in readiness for use is to enlarge and extend the intent of Congress in enacting the legislation." *Id.*

This Court reached a similar conclusion in *Tisneros v. Chicago & Northwest Railway Company*, 197 F.2d 466 (7th Cir. 1952), which involved a "fire up man" whose job it was to either "keep the fire up" in steam-powered locomotives about to depart the rail yard, or "knock the fire out" in those engines that were not about to leave. *Id.* at 467. The plaintiff slipped and fell on ice while performing that duty alone on a locomotive and brought a claim against the railroad under the BIA. *Id.* While it was unclear whether the engine was running when the plaintiff was injured, that was not dispositive because it was clear that the locomotive was "idle and *inactive.*" *Id.* (emphasis added). Examining facts substantially similar to those presented in *Lyle*, the *Tisneros* court relied on that earlier decision to hold that "[c]ertainly it can not be said that in such a situation the engine was in use on the defendant's line." *Id.*

Unlike Plaintiff, Union Pacific does not insist that the facts of these or any other cases cited by either party are directly on point. The truth of the matter is that no case identified by either party presents exactly the same facts as those at issue here. *Lyle* and *Tisneros* do nonetheless share some important factual similarities with this case and, more importantly, they are instructive because they reflect the understanding that courts considering whether a locomotive is "in use" should distinguish between locomotives that are being operated or are ready to be operated, and locomotives that are not operating or are merely being readied for future operation. *Lyle* and *Tisneros* are the law of this circuit and their principle should

17

control here, where there is no question that UP 5683 was neither being operated nor was it about to be operated to pull a train or to perform any other locomotive function when Plaintiff's alleged accident occurred.

As in *Lyle*, Plaintiff here was allegedly injured by slipping on an oily substance before the locomotive was made operational. The record is clear that at the time of the alleged accident UP 5683 was sitting inactive in the yard, it had not yet been assembled into its train, it had not yet resumed its journey to its next destination, a good deal of switching work needed to be done before it could resume its journey, and it was not going to be operated to pull that train to its next destination. In circumstances involving a worker injured while the locomotive was not operating and was being put in readiness for operation, this Court has found that applying the LIA's strict liability standard would impermissibly exceed the scope of Congress's intent in passing the LIA. *Lyle*, 177 F.2d at 223. As the district court held, the same conclusion should be reached here. Dkt. 85 at 8.

Importantly, however, this case presents an additional fact not clearly present in *Lyle*, *Tisneros*, or the other cases discussed by the parties, but which self-evidently distances it from those in which courts have struggled to decide whether a locomotive is "in use," is ready for "use," or is being prepared for "use": Plaintiff was tagging UP 5683 for *non-operation* when his alleged accident occurred. Put plainly, the locomotive was not doing and was not scheduled to do anything. It was set to be "running dead" when it later left for its destination, where it was to be inspected, maintained, and only then put back into service pulling trains. Dkt. 49-1 at 22-23;

Dkt. 49-5 at 10. Plaintiff admitted that he was tagging UP 5683 for non-operation because he "wasn't operating it" and "[i]t wasn't in [his] consist" the day of his alleged accident. *Id.* at 28-29, 47. If anything, the case for "non-use" here is even stronger than those presented in *Lyle* and *Tisneros* as it was unclear in both cases whether the locomotives were subsequently pressed back into use soon after being serviced.

If the plain and ordinary meaning of the phrase "in use" is to be applied, as it should be (*Jones v. Hanley Dawson Cadillac Co.*, 848 F.2d 803, 806-07 (7th Cir. 1988) ("[w]ords in a statute are to be given their plain and ordinary meaning")), and Congress's limited intent for the LIA to apply only to locomotives in "*active* service" (*Urie*, 337 U.S. at 190 (emphasis added)) so as to "ensure [they are] 'in proper condition and safe *to operate"* (*Ward*, 901 F.3d at 873 (emphasis added)) is to be respected, then it cannot be concluded under these facts that UP 5683 was "in use" at the time of Plaintiff's alleged accident. To use something is to "put it into action or service." Merriam-Webster Online Dictionary (defining "use" as "to put into action or service"), https://www.merriam-webster.com/dictionary/use; *see also* Black's Law Dictionary 1681 (9th ed) (defining "use" as "[t]he application or employment of something"). When Plaintiff was allegedly injured in this case, he was tagging UP 5368 precisely so that it would not be put into action or service—so that it would not be "used." To conclude that this constitutes "use" under the LIA would therefore require the Court to divorce that word from any reasonable semblance of its meaning.

### 2. Decisions from other circuits addressing what constitutes "use" also support the district court's judgment.

Other federal circuit courts have rightly agreed with this Court that a locomotive should not be considered to be "in use" under the LIA unless it is actually being operated or it is at least ready for operation, rather than being unoperated or being prepared for future operation, at the time of a worker's accident—although the manner in which those courts make that determination differs.

For instance, the Eighth Circuit in *Wright v. Arkansas & Missouri Railroad Company*, 574 F.3d 612 (8th Cir. 2009), involved a plaintiff injured while training as an assistant conductor and who subsequently brought an LIA claim against the railroad. *Id.* at 614. The facts in *Wright* are broadly similar to those here. The plaintiff was part of the railroad's transportation crew and, on the day of his accident, he arrived at a rail yard and began preparing his locomotive for a run. *Id.* at 615. The plaintiff was injured when in the course of this work he slipped off an oil-covered ladder and fell to the ground. *Id.* Unlike here, the locomotive was sitting on a "repair in place" track in the yard and had blue flags hung warning its crew not yet to move it, although the locomotive was not in a maintenance facility and the parties disputed whether it had been completely inspected before the plaintiff's fall. *Id.* Applying a totality of the circumstances analysis, the Eighth Circuit held that the locomotive was not "in use" at the time of the plaintiff's accident. *Id.* at 621.

The Fourth Circuit in *Angell v. Chesapeake and Ohio Railway Company*, 618 F.2d 260 (4th Cir. 1980), involved a machinist injured by a blast of high pressure air released by a defective air brake. *Id.* at 261. In examining the "in use" question under

the plaintiff's LIA claim, the reviewing court distinguished *Angell* from *Lyle* because the servicing, inspection and maintenance in *Angell* had already been performed before the plaintiff was injured, and the locomotive was "readied" and "okayed" for operation and departure. *Id.* at 262. The Fourth Circuit found that the vehicle's readiness for operation was the dispositive consideration in the circumstances and thus concluded the locomotive was "in use" because it was ready for imminent departure. *Id.* This is consistent with the Fourth Circuit's subsequent decision in *Deans v. CSX Transporation, Inc.*, 152 F.3d 326 (4th Cir. 1998), which adopted a totality of the circumstances analysis and distinguished between trains ready for "imminent departure" and those in storage or—as here—waiting to be moved to a repair location. *Id.* at 330.

The First Circuit considers "the determinative factors" when deciding whether a locomotive is "in use" under the LIA to be the location of the locomotive at the time of the injury and the activity of the injured party. *McGrath*, 136 F.3d at 842. This was the standard adopted by the Fourth Circuit in *Deans* as well. *Deans*, 152 F.3d at 330. And it is the standard Plaintiff urges this Court to adopt in the place of *Lyle* and *Tisneros*, though he argues it is already the law of this circuit. In *McGrath*, the locomotive was neither being serviced in a place of repair nor on the main line when the plaintiff engineer was injured after slipping on a fastening nut, but was idling on a yard track and ready to move into service. *Id.* at 840, 842. The First Circuit found in applying its two-prong approach that because the locomotive was ready to move back into service on the main line, it was "in use" and the LIA applied. *Id.* at 842.

21

The Fifth Circuit asks whether a train is fully assembled and all inspections are completed, holding that any train being prepared but short of that point is not "in use." *Trinidad v. Southern Pacific Transportation Company*, 949 F.2d 187 (5th Cir. 1991). The plaintiff in *Trinidad* was a carman injured while walking across a railroad's yard tracks to inform his engineer of a problem with a tank car's air brakes. *Id.* at 188. Examining whether the car was "in use" at the time of the plaintiff's accident under the Federal Safety Appliance Act, 49 U.S.C § 20301 *et seq.* ("FSAA"), which contains similar "use" language as that in the LIA, the Fifth Circuit concluded the car was not "in use" because the plaintiff was still inspecting it when he was injured and the train was not yet fully assembled and ready to depart. *Id.* at 189.

The Tenth Circuit interprets Congress's intent behind the term "'used on its line' to mean used in moving interstate or foreign commerce." *Estes v. Southern Pacific Transportation Company*, 598 F.2d 1195, 1198 (10th Cir. 1979). The plaintiff in *Estes* was a hostler injured while opening a locomotive cab door so he could move the engine over to a yard service track for maintenance. *Id.* at 1196-97. Although the locomotive could have been pressed back into service on the main line in as few as two hours, the Tenth Circuit held that because the locomotive was not moving in interstate commerce at the time of the accident, it was not "in use" under the LIA. *Id.* at 1196, 1198-99. The Tenth Circuit also noted that although Congress meant for the BIA (not LIA) to be liberally construed to protect workers and others' safety, that statement, read in its proper context "had to do with the breadth of the safe

equipment requirement of the [BIA] *not* the use of a locomotive unit at the time of the accident." *Id.* at 1198 (emphasis added).

These cases demonstrate that while the analyses used by federal reviewing courts may differ in their expression, an important commonality runs through and binds them all: at their core, they ask whether a locomotive or train is actually being operated or is at least immediately ready for operation at the time of a plaintiff's injury, and they distinguish those situations from circumstances in which the locomotive or train is not being operated or is still being prepared in one manner or another for future operation. In these cases, the railroad equipment is found to be "in use" in the first set of scenarios, but not the second. This rationale connects all or at least most federal circuit court jurisprudence on the LIA's "in use" issue, reconciling authority that might otherwise seem irreconcilable; and here it favors the district court's holding that UP 5683 was not "in use" when Plaintiff was allegedly injured. As in *Lyle*, there is no question that UP 5683 was not being operated and was not yet ready for operation at the time of Plaintiff's alleged accident. Indeed, the locomotive was not yet even assembled into a train and it was not scheduled to be operated in any capacity before it received its inspection and maintenance at its next destination.

### 3. Plaintiff's arguments for why UP 5683 was "in use" at the time of his alleged accident fail for several reasons.

Plaintiff urges this Court to adopt what he says is already the law of this circuit; namely, the First and Fourth Circuit's totality of the circumstances analysis, in which the primary factors are the location of the locomotive at the time of the injury and the activity of the injured party. Pl.'s Br. 18. In doing so, Plaintiff relies on

mischaracterizations of the factual record which, if accepted, would result in a factually foundationless outcome. Reaching such an end would also require the Court to set aside *Lyle* and 70 years of precedent standing for the judicious proposition that in answering whether a locomotive is "in use" under the LIA, courts should examine whether it was—in any reasonable sense of the phrase—actually being used or about to be used to perform its locomotive function.

> ### i. Plaintiff's argument that the LIA should apply at all times except when a locomotive is undergoing repairs in a place of repair ignores Congress's intent for the statute to ensure the safe operation of active locomotives.

Plaintiff argues that the location of UP 5683 at the time of his alleged accident and his activity in that moment support his position that it was "in use" when he allegedly fell. He is mistaken, in no small part because the factual underpinnings of his argument are unsupported. Specifically, Plaintiff says that the locomotive was "in use" because it "was powered on and running on the yard track in UP's Salem Yard, having been used in the train trip from Chicago" and because "it was not in a place of repair, nor was it undergoing repair, maintenance or inspection" at the time of his alleged accident. Pl's Br. 18.

As explained above, there is no record support for his assertion that UP 5683 was "used" when transported from Chicago. This leaves as factual support for Plaintiff's position only that the locomotive's engine may have been running, and the locomotive was not in a place of repair while undergoing repairs. Plaintiff argues on the first point that locomotives in the process of being shut down are "in use," citing a single district court opinion from Massachusetts to support that contention, *Horibin*

*v. Providence & Worcester R.R. Co.*, 352 F. Supp. 2d 116 (D. Mass. 2005). Pl.'s Br. 17. Such reasoning contradicts this Court's decision in *Tisneros*, where the injured worker's job was to either power up or down a locomotive and the Court still found the locomotive was not "in use." *Tisneros*, 197 F.2d at 467-68. But even viewing Plaintiff's equivocal testimony on whether the engine was running in a light most beneficial to him, it would be just one of several facts to consider when determining whether the locomotive was "in use." More important than the possibility that the engine was running is the uncontested fact that Plaintiff "wasn't operating it" at the time of his alleged accident and "[i]t wasn't in [his] consist." Dkt. 49-1 at 28-29, 47. This alone distinguishes *Horibin*, where the plaintiff was injured in the last stage of operating the locomotive at the end of his run. *Horibin*, 352 F. Supp. 2d at 118.

Further, Union Pacific concedes that UP 5683 was not in a place of repair or undergoing repair when Plaintiff allegedly fell, although, as explained above, Plaintiff's characterization of the back track as an "active" track is misleading. However, as also discussed above, Plaintiff neglects to consider that at the time of his alleged injury UP 5683 was not operating and was not scheduled to operate in any capacity. The locomotive was to be "running dead," pulled to Pine Bluff for inspection and maintenance. Dkt. 49-1 at 22. In Plaintiff's words, and for this reason, he "wasn't operating it" and "[i]t wasn't in [his] consist" on the day of his alleged accident. *Id.* at 28-29, 47. When Plaintiff was tagging the locomotive for non-operation, he was therefore not doing anything to operate it or even to prepare it for operation.

By relying on the fact that UP 5683 was not in a place of repair or being repaired when he allegedly fell, and arguing that this establishes "use," Plaintiff asks this Court to take an extremely narrow view of the LIA's "in use" requirement by holding that any locomotive that is not actively undergoing inspection, maintenance or repair in a place designated for such work is "in use." Such a test would quickly lead to absurd consequences. If Plaintiff is correct, then a locomotive sitting on a rail yard's back track for years would be considered "in use" if not in a maintenance area undergoing inspection, maintenance or repair. And if a railroad worker was somehow injured while aboard such a locomotive, perhaps by slipping on its exterior walkway while retrieving an item from its cab, the railroad would be subject to strict liability.

That would be an absurd consequence and surely not one that Congress intended when, in the Supreme Court's words, it passed the LIA to "insure that such [railroad] equipment be employed in *active* service without unnecessary peril to life or limb." *Urie*, 337 U.S. at 190 (emphasis added) (internal quotation marks omitted); *see also Zbaraz v. Madigan*, 572 F.3d 370, 387 (7th Cir. 2009) (courts will not "construe a statute in a way that leads to absurd results"). When passing the LIA, Congress intended for locomotives to "be safe *to operate*." *Id.* (emphasis added). For injury cases like Plaintiff's, involving the non-operation of railroad equipment, Congress passed the FELA with its less stringent negligence standard.

### ii.    Authority discussing locomotives already performing their function and operating in commerce is inapplicable here.

Plaintiff also argues that temporarily motionless locomotives, whose use in commerce has not come to end, remain "in use" under the LIA. Pl.'s Br. 15-16. Plaintiff

primarily references *Brady v. Terminal Railroad Association of St. Louis*, 303 U.S. 10 (1938), and *Holfester v. Long Island Railroad Company*, 360 F.2d 369 (2d Cir. 1966), which relied almost entirely on *Brady*, for this proposition. Both *Brady* and *Holfester* involved situations where a train car was temporarily removed from service for a brief inspection. In *Brady*, the car was taken to a yard's receiving track, remained part of a train, and was to be immediately returned to the main line if no defects were found that rendered its continuation unsafe. *Brady*, 303 U.S. at 11, 13. In *Holfester*, a self-propelled mail-carrier car was taken to a live side track, left running and ready to go, and was scheduled to return to the main line after it was briefly inspected and its mail unloaded. *Holfester*, 360 F.2d at 372. The courts in both cases held that the cars remained "in use."

What distinguishes the cars in *Brady* and *Holfester* from the locomotive at issue here is that both of those cases involved rail cars, not locomotives, still operating and performing their function when the plaintiff was injured. Put differently, both *Brady* and *Holfester* involved cars that were never withdrawn from use, although they had briefly paused in their movement. *Brady*, 303 U.S. at 13; *Holfester*, 360 F.2d at 372. The lesson of those cases is inapplicable where, as here, a locomotive, which has a different function in railroad operations, was not operating and performing its function and therefore cannot be said to have been in continuous use.

It is clear that the locomotive here was not operating and was not about to be operated in pulling a train on the day of Plaintiff's alleged accident. UP 5683 was to "run dead" to its next destination, where it would receive an inspection and

27

maintenance before returning to service on the main line. Dkt. 49-1 at 22; Dkt. 49-5 at 10. Again, Plaintiff admitted that he "wasn't operating it" and "[i]t wasn't in [his] consist" the day of his alleged accident. *Id.* at 28-29, 47. Thus, unlike the cars in *Brady* and *Holfester*, UP 5683 was not operating and performing its locomotive function, nor was it ready to do so, when Plaintiff's alleged accident occurred.

The statute at issue in *Brady*, the FSAA, is nonetheless instructive. The "in use" requirements in the LIA and FSAA are generally interpreted interchangeably because they are similarly worded and because both statutes exist to ensure that safe equipment is used on railroads. 49 U.S.C. § 20302; *Steer v. Burlington N., Inc.*, 720 F.2d 975, 976 n.3 (8th Cir. 1983). And courts examining the FSAA's "in use" requirement have discussed the importance of considering the function of a railroad vehicle when deciding whether it is "in use."[4]

The Supreme Court in *United States v. Erie Railroad Company*, 237 U.S. 402 (1915), recognized that different types of railroad vehicles have different uses and the statutory safety requirements for each vary based on how they are actually used. *Id.* at 407-08. Building on that recognition, a growing number of district courts have held that when considering whether a railroad vehicle is "in use" under the FSAA, one must take account of the function the vehicle was performing at the time of an accident, which in turn results in differing "in use" inquiries. *See, e.g., Robb v.*

---

[4]     The FSAA defines a "vehicle" as a "car, locomotive, tender or similar vehicle." 49 U.S.C. § 20301(a).

*Burlington N. & Santa Fe Ry. Co.*, 100 F. Supp. 2d 867 (N.D. Ill. 2000); *Underhill v. CSX Transp., Inc.*, 1:05-cv-196-TS, 2006 WL 1128619 (N.D. Ind. Apr. 24, 2006).

While those district court decisions have gone too far in contradicting circuit court authority when appearing to hold that all vehicles involved in switching operations are "in use" under the FSAA (*see*, *Phillips v. CSX Transp., Inc.*, 190 F.3d 285, 289 (4th Cir. 1999) ("the FSAA does not apply to train cars involved in switching operations")), that question is not currently before this Court. Cases like *Robb* and *Underhill* are nonetheless instructive because they highlight the fact that in order to determine whether a railroad vehicle is "in use," courts should consider the function and operation of that vehicle.

Therefore, as in *Brady*, a rail car used to carry cargo or passengers may be continuously "in use" so long as its pause in transit is only briefly interrupted while performing that task. *Brady*, 303 U.S. at 13. As in *Holfester*, a self-propelled mail-carrier car may likewise be continuously "in use" when it is temporarily placed on a side track with its engine idling as it waits to deliver its cargo of mail. *Holfester*, 360 F.2d at 372. But a locomotive, the function of which is to pull trains on the main line, or in some cases to perform switching operations in a yard, cannot be said to be "in use" when it is not even operating or about to be operated.

Plaintiff cites *Southern Railway Company v. Bryan*, 375 F.2d 155 (5th Cir. 1967), for the proposition that a wrecked locomotive may be considered "in use" when being transported to a place of repair. But *Bryan*, and more importantly the Supreme Court authority upon which it relied, *Texas & Pacific Railway Company v. Rigsby*,

29

241 U.S. 33 (1916), involved situations which, in this Court's analysis, are "clearly distinguishable" from cases like this because they involved equipment that was "still in use on the tracks" of the railroad. *Lyle*, 177 F.2d at 223. As this Court said, "the question [in *Rigsby*] was … whether [the car] had been withdrawn from service and … the facts were such that the court could not say that use had terminated; the cars or locomotives were still in commerce" because they were still out on the main line. *Lyle*, 177 F.2d at 223. The same was true in *Bryan*. 375 F.2d at 157. But for all the reasons stated above, the same cannot be said here of UP 5683.

### iii. The readiness of a locomotive to depart a rail yard is directly relevant to whether it is "in use."

Plaintiff next argues that courts find as a matter of "routine" that trains may be "in use" under the LIA even if work remains to be done before they depart a rail yard. Pl.'s Br. 16. The truth is that the law is mixed on this question. Plaintiff chiefly relies on the Fourth Circuit's decision in *Angell* for his argument that locomotives being moved within a yard to a place where they will be formed into a consist prior to pulling a train are "in use." *Id.* at 17. However, *Angell* involved an injury on a locomotive that had already received all the servicing it required to return to operation on the main line and was "readied" and "okayed" for use in pulling a train, which was waiting for imminent departure. *Angell*, 618 F.2d at 262. The Fourth Circuit found that an injury sustained while moving the readied locomotive into position for immediately pulling the train was "in use." *Id.* That is not the case here, as UP 8683 had not yet been inspected, it was not being used to pull a train, and it was not readied for operation—it was simply being tagged for non-operation.

The Fourth Circuit's more recent decision in *Phillips* is closer to the mark. The plaintiff in *Phillips* was injured while finishing a switching operation connecting a locomotive to an otherwise assembled train set to depart a rail yard. *Phillips*, 190 F.3d at 287, 290. In deciding whether the locomotive was "in use," the reviewing court looked to the totality of the circumstances, paying special attention to the location of the train at the time of the accident and the activity of the plaintiff, although its analysis seems to have turned on the latter factor. *Id.* at 290. The court concluded that because the plaintiff "was injured at the end of the switching process, rather than at the beginning of the departure process," the train was not "in use." *Id.* The same is true here.

Although Plaintiff downplays the fact that the train here was not yet assembled, saying repeatedly that only "some" work remained before it could depart (*see*, *e.g.*, Pl.'s Br. 4, 16, 19, 25), the district court discussed the fact and importance of the amount of work that remained to be done when Plaintiff allegedly fell, noting Plaintiff's admission that "the train was not yet set up and ready to go" and that he had to perform "[m]ore than three" switching operations before the train was even assembled, much less ready to go. Dkt. 85 at 8. Unlike in *Angell*, the locomotive here was not inspected and "readied" or "okayed" to operate on the main line. Plaintiff was injured while tagging it for non-operation.

Plaintiff relatedly argues that the district court improperly construed the Fourth Circuit's decision in *Deans* as requiring an engine to be ready for imminent departure before it can be considered "in use," arguing "[t]o the contrary, the *Deans*

31

court found that the engine was in use even though work remained to be completed before the train could depart." Pl.'s Br. 23. It is Plaintiff who misconstrues *Deans*, where the court expressly considered that "although the train had not yet begun moving on the main track" when the plaintiff was injured "it had already had its engine coupled to it and was standing on a track in the rail yard in preparation for imminent departure." *Deans*, 152 F.3d at 330. The fact that the train in *Deans* was ready to go after a routine air brake test was quickly performed factored heavily into the court's decision finding the train at issue in that case was "in use."

## III.   The district court correctly entered summary judgment for Union Pacific on Plaintiff's FELA claim because there is no evidence that his alleged accident was foreseeable.

Plaintiff argues that the district court also erred in holding that he failed to present evidence raising a genuine issue of material fact as to whether Union Pacific had notice of the oily substance on UP 5683's walkway before his alleged accident. A plaintiff bringing an FELA claim "must offer evidence proving the common law elements of negligence, including duty, breach, foreseeability, and causation." *Williams v. Nat'l R.R. Passenger Corp.*, 161 F.3d 1059, 1062 (7th Cir. 1998). "The FELA holds railroads to a prudent-person standard of care, and a plaintiff who wishes to demonstrate that a railroad breached its duty must show circumstances that 'a reasonable person would foresee as creating a potential for harm.'" *Id.* (quoting *McGinn*, 102 F.3d at 300).

Foreseeability "is an essential ingredient in FELA negligence" and this Court has "consistently … declined to infer negligence when a plaintiff fails to produce any

evidence suggesting that the employer played even the slightest role in bringing about the injury." *Id.* A railroad cannot be held liable "if it has no reasonable way of knowing that a potential hazard exists." *Id.* at 1062-63. A "railroad's duties are measured by what is reasonably foreseeable under like circumstances" and if an accident is not reasonably foreseeable "then the [railroad] is not required to do anything to correct the condition"; that is, the railroad has no duty to act. *CSX Transp., Inc. v. McBride*, 564 U.S. 685, 703 (2011). "To establish such foreseeability, a plaintiff must show that the employer had actual or constructive notice of those harmful circumstances." *Holbrook*, 414 F.3d at 742.

### A. Plaintiff presented no evidence from which a jury could reasonably conclude that Union Pacific had actual notice of the oily substance that allegedly caused Plaintiff's injury.

Relying primarily on this Court's decision in *Holbrook v. Norfolk Southern Railway Company*, 414 F.3d 739 (7th Cir. 2005), the district court found a complete absence of facts allowing a reasonable jury to conclude that Union Pacific had actual or constructive notice of the substance on which Plaintiff allegedly slipped, and thus an absence of support for any conclusion that Plaintiff's accident was foreseeable. Dkt. 85 at 10-13. It was right to do so. Plaintiff's foreseeability arguments rely entirely on speculation, not facts. This case therefore falls squarely within this Court's decision in *Holbrook*, authority to which Plaintiff tellingly dedicates but two sentences of his analysis.

The plaintiff in *Holbrook* was a conductor injured when, in the course of preparing his train for departure from a rail yard, he slipped off a rail car ladder and

fell to the ground. *Holbrook*, 414 F.3d at 740. The plaintiff afterwards inspected the ladder and noticed a sticky, oily substance on the rung from which he fell, which he wiped up with a towel. *Id.* As here, the plaintiff had no evidence indicating whether the substance was on the ladder before he came to it or whether he tracked it onto the ladder with the bottom of his boot, although he claimed that it must have come from the yard because he only wore his work boots when at work. *Id.* The plaintiff brought an FELA claim against his employer and the district court entered summary judgment for the railroad due to the absence of facts reasonably supporting a foreseeability finding. *Id.*

In considering foreseeability on appeal in *Holbrook*, this Court explained that the dangerous condition of which the railroad must have had notice to be liable was the "tiny dab of grease," or its origins, that resulted in the plaintiff's fall. *Id.* at 742. The evidence established that the substance "somehow ended up on the ladder," and that the plaintiff slipped on it, but not where the substance came from. *Id.* The plaintiff argued that if he tracked the grease onto the ladder with his boots, then the railroad had actual notice of the dangerous condition because the grease likely came from pools of oil that would accumulate on the rail yard's grounds. *Id.* There was evidence of record that such pools of oil existed, that the railroad was aware of them, and that the railroad did nothing to prevent them from accumulating. *Id.* at 742-43. But this was not enough to establish actual notice. *Id.*

The *Holbrook* court explained that to succeed in his actual notice argument, the plaintiff was required to show not only the identity of the dangerous condition

and the railroad's knowledge of it, but also to "connect that known condition to his injury." *Id.* at 743. The railroad's notice of oil pools in the yard would be "wholly irrelevant" to the plaintiff's claim "absent a showing that such known conditions in fact caused his injury." *Id.* "Thus, in order to connect his injury to the known condition, two further assumptions would be required: that an accumulated oil pool was present *on the day* Holbrook was injured, and that Holbrook in fact stepped in that pool—or at least in its vicinity—before mounting the ladder." *Id.* (emphasis original). The plaintiff could do neither.

The plaintiff in *Holbrook* instead leaned on the FELA's relaxed causation standard to argue, like Plaintiff here, that his burden was "merely to establish a reasonable inference that those known dangerous conditions played a part in his injury." *Id.* Relying, as Plaintiff also does here, on *Gallick v. Baltimore & Ohio Railroad Company*, 372 U.S. 108 (1963), he argued that his evidence was sufficient to establish a reasonable inference that the oil pools played such a part. *Id.* at 743-44. However, like Plaintiff here, the plaintiff in *Holbrook* failed to appreciate that inferences are only reasonable if they are based on evidence. This point was made in the *Holbrook* court's analysis of *Gallick*.

In analyzing the applicability of *Gallick* to the foreseeability issue in *Holbrook*, this Court acknowledged several parallels between the cases. *Id.* at 744. *Gallick* concerned a worker who became ill after an insect bite, and who claimed the insect that bit him came from fetid pools of stagnant water allowed to sit in a rail yard. The plaintiffs in *Gallick* and *Holbrook* introduced evidence identifying the dangerous

conditions their probable sources, and in both cases there was evidence the employers knew of those dangerous conditions (*i.e.*, the cesspools in *Gallick* and the oil pools in *Holbrook*). *Id.*

But while the plaintiff in *Gallick* could place the agent of his injury (*i.e.*, the insect) "within the temporal and physical vicinity of the dangerous condition" (*i.e.*, the cesspool), the plaintiff in *Holbrook* could not do the same. *Id.* This was the deciding difference between the two cases. The *Holbrook* court said that the "temporal and physical proximity to the known hazard rendered reasonable the inference that the [dangerous] condition played a part in Gallick's injury," but "[s]urely, if Gallick had not been able to establish the existence of a cesspool on his employer's premises or his presence near it at the time he was bitten by the insect, no reasonable inference could be drawn that th[e] cesspool might have played a party in his injury." *Id.*

The plaintiff in *Holbrook*, unlike the plaintiff in *Gallick*, was not only uncertain whether he stepped in oil on the day of his accident, he was also uncertain whether there was oil on the rail yard's ground that day. *Id.* The *Holbrook* plaintiff thus offered no evidence that there was a nearby source of oil he may have stepped in on the day of his accident, much less evidence that he stepped in or worked nearby such a pool. *Id.* "Because the plaintiff [could not] place himself within the temporal or physical vicinity of the proffered, known dangerous condition, let alone establish that condition's very existence on the day of the incident, it would not be reasonable to infer that putative pools of accumulated oil in the [yard] played a part in [his] injury."

36

*Id.* The plaintiff thus failed to put forward facts supporting his claim that the railroad had actual notice of the hazard that caused his injury. *Id.*

The type of facts at issue in *Holbrook* and the analysis employed by this Court in considering those facts are dispositive here as well. As in *Holbrook*, Plaintiff here allegedly slipped on oil, grease, or some similar substance that he did not see before his fall. As in *Holbrook*, Plaintiff does not allege that the railroad actually saw the substance on the locomotive before his alleged accident. As in *Holbrook*, Plaintiff has introduced no facts as to whether the oily substance was on UP 5683's walkway before his fall or whether he tracked it onto the locomotive with the bottom of his boot. Thus, as in *Holbrook*, Plaintiff cannot identify where the substance came from. Although, unlike *Holbrook*, Plaintiff here has introduced no evidence that Union Pacific was even aware of a potentially dangerous condition.

To succeed in his actual notice argument, Plaintiff in this case must do what the plaintiff in *Holbrook* failed to do, place himself within the temporal or physical vicinity of the source of the hazard. This he cannot do, as his case is even weaker than that rejected by this Court in *Holbrook*. The plaintiff in *Holbrook* at least had a theory supported by some evidence that the oil on which he slipped came from the rail yard grounds. Plaintiff here has no such evidence. There is no evidence that a similar substance was found anywhere in the vicinity of UP 5683, the evidence is uncontradicted that there was no other oil spots found anywhere on UP 5683 when it was inspected after Plaintiff reported his accident, and it is undisputed that there were no locomotive components in the vicinity of Plaintiff's fall that could have leaked

and left oil or a similarly slippery substance on the walkway. Dkt. 49-5 at 11; Dkt. 54-2 at 3.

Plaintiff consequently cannot place himself within the vicinity of the source of the hazard because he has no evidence identifying a potential source of the hazard, much less evidence temporally or physically linking him to such a source. Without such evidence, and without evidence demonstrating that Union Pacific otherwise knew of the oily substance's presence on UP 5683, there are no facts of record from which a jury could reasonably infer that Union Pacific had actual notice of the hazard that caused Plaintiff's alleged accident. No amount of leaning on FELA's relaxed causation standard can change the complete absence of facts supporting a finding of actual notice, and thus of foreseeability, here.

Plaintiff disagrees, arguing that the "Supreme Court has made clear that FELA jury verdict [*sic*] can be based solely on 'speculation, conjecture and possibilities.'" Pl.'s Br. 28 (quoting *Gibson v. Elgin, Joliet & E. Ry. Co.*, 246 F.2d 834, 837 (7th Cir. 1957)). Plaintiff is mistaken, and if that were true, there would be little need for trials in FELA actions as defending against them would be all but impossible. The quotation from *Gibson* relied on by Plaintiff relates to FELA's relaxed causation standard, not foreseeability—a distinction Plaintiff frequently fails to make throughout his brief. *See also Lynch v. N.E. Reg'l Commuter R.R. Corp.*, 700 F.3d 906, 917-18 (7th Cir. 2012) (discussing defendant's failure to distinguish between FELA's relaxed causation standard and the still essential foreseeability requirement).

Further, and respectfully, the Court's statement in *Gibson* was exaggerated, reflecting a mistaken understanding of a dissenting opinion in *Ferguson v. Moore-McCormack Lines, Inc.*, 352 U.S. 521, 564 (1957), rather than the well-established law on this issue. This point explicitly made in a memorandum accompanying the denial of *certiorari* in *Gibson*, wherein the Supreme Court authors of the dissent relied on for that mistaken statement in *Gibson* clarified that "[n]ot until this Court explicitly holds that in 'F.E.L.A. cases, speculation, conjecture and possibilities suffice to support a jury verdict,' which is the holding of the Court of Appeals in [*Gibson*] is that to be assumed to be the law of this Court." *Elgin, Joliet & E. Ry. Co. v. Gibson*, 355 U.S. 897, 78 S.Ct. 270 (1957). The Supreme Court thereafter never held that FELA claims may be based entirely on speculation and conjecture.

This Court thus never subsequently held that a verdict in an FELA case can be based solely on mere speculation and conjecture, rather than reasonable inferences drawn from facts. *See Swartz v. N.Y. Cent. R.R. Co.*, 323 F.2d 713, 714 (7th Cir. 1963) (stating that "some evidence ... "must be adduced" to support the FELA's negligence elements, "otherwise speculation would be substituted for probative facts and reasonable inferences drawn from those facts"). While a measure of speculation and conjecture may be used to draw reasonable inferences from established facts, some facts must exist from which those reasonable inferences may be drawn. *Lynch*, 700 F.3d at 917. "Thus, a plaintiff must proffer some evidence of the defendant's negligence in order to survive summary judgment" in an FELA action. *Holbrook*, 414

F.3d at 742. Even in FELA cases, "[s]peculation cannot supply the place of proof." *Moore*, 340 U.S. at 578.

Rather than rely on the correct legal standard to advance his argument, Plaintiff falls back on additional misrepresentations of the record, stating, or instance, that "it is undisputed that … UP regained possession of UP5683 on August 11 2016 in Chicago and returned it to service at that time" (Pl.'s Br. 30), when, as discussed above, there is no evidence the locomotive was "returned to service" between Chicago and the Salem Yard.

Plaintiff further argues that UP 5683 could have been refueled or received lubrication in Chicago and, if so, it would be reasonable to infer that oil was then spilled on its walkway. Pl.'s Br. 30. This argument is not based on facts, but rather speculation piled on top of speculation, as Plaintiff offers no evidence that UP 5683 received fuel or lubrication at Union Pacific's Chicago facility. As the district court found, there are a "'myriad of possible ways the substance could have gotten onto' the walkway," but without some facts linking those possibilities to the hazard, they are insufficient to defeat summary judgment. Dkt. 85 at 12 (quoting *Holbrook*, 414 F.3d at 475).

## B.  Plaintiff presented no evidence from which a jury could reasonably conclude that Union Pacific had constructive notice of the oily substance that allegedly caused Plaintiff's injury.

Plaintiff alternatively argues that he "adduced facts sufficient to establish UP's constructive knowledge" of the hazard. Pl.'s Br. 30. Plaintiff points in support of this argument to the fact that UP 5683 was not inspected by Norfolk Southern before its

return to Union Pacific, and to Union Pacific's supposed "failure" to inspect the locomotive immediately after regaining possession of it. *Id.* Plaintiff argues from this that "there is no genuine dispute that UP violated 49 C.F.R. § 229.21(b) by allowing UP5683 to be placed, and remain, in service leading up to Ledure's injury incident." *Id.* at 30-31. He adds that "[c]ritically, UP admits that there were scheduled inspection tasks that needed to be completed once the locomotive came back into its possession, yet these inspections were not completed until after LeDure was injured." *Id.* at 31. These assertions are also unsupported.

While it is true that UP 5683's records reflect that it was not inspected in the days leading up to its return from Norfolk Southern to Union Pacific, or in the few hours immediately after Union Pacific regained possession of the locomotive, it is also true that there is no evidence the locomotive was used during that time period. Federal regulations require only that locomotive "*in use* shall be inspected at least once during each calendar day." 49 C.F.R. § 229.21(a) & (b) (emphasis added). Plaintiff cites no regulation requiring Union Pacific to daily inspect unused locomotives. Without establishing that UP 5683 was returned to use by Union Pacific before Plaintiff's fall, his argument that Union Pacific should be held to have been on constructive notice of the hazard is both factually and logically unsupported.

Plaintiff's statement that "UP admits that there were scheduled inspection tasks that needed to be completed once the locomotive came back into its possession" (Pl.'s Br. 31) is similarly unsupported. In fact, Union Pacific's Senior Specialist Thomas Kennedy testified without contradiction as follows:

> Q:     Anytime a locomotive that has been lent out to another railroad comes back to Union Pacific, it's supposed to be inspected?
>
> A:     *No.* There's just certain tasks that are going to be – depending upon how long – our system is going to automatically trigger certain inspections and maintenance and service.

Dkt. 55-1 at 7 (emphasis added). In other words, inspections are performed periodically based on the passage of time and use, as the law requires. Union Pacific did not admit that it was required to inspect UP 5683 immediately upon its return from Norfolk Southern, as the law requires no such inspection. Further, even if the locomotive was returned to use after its return, that fact alone would not establish a violation of the inspection requirement because Union Pacific would have had the remainder of the day to perform an inspection. Plaintiff's unsupported assertions therefore do nothing to advance his constructive notice argument.

Plaintiff further argues that it would be reasonable for a jury to infer that if Union Pacific had inspected UP 5683 before he boarded it on August 12, 2016, the oily substance would have been discovered. Pl.'s Br. 32.[5] A similar argument was made and rejected in *Holbrook*, where the plaintiff argued that company procedures required pre-departure inspections of railroad vehicles and "if the grease was on the ladder before he came to it, the inspectors should have discovered it." *Holbrook*, 414 F.3d at 744. This Court found the *Holbrook* plaintiff's argument faulty because "there [was] absolutely no evidence that the grease was on the ladder before Holbrook

---

[5]     Plaintiff does not repeat the argument he made below that Union Pacific was on notice of the hazard because oil was previously discovered on the locomotive (three years before his alleged accident).

stepped on it." *Id.* "And even assuming that the grease was on the ladder before Holbrook stepped on it, there are a myriad of possible ways the substance could have gotten onto the ladder between the railcar's inspection and its contact with Holbrook," including splatter from a passing train on an adjacent track, or residue from mounting by another employee. *Id.* at 744-45. This Court thus held that "[b]ecause plaintiff's constructive notice argument 'rests on mere speculation and conjecture,' it too must fail." *Id.* at 745 (quoting *Deans*, 152 F.3d 330).

As the district court found, the same is true of Plaintiff's constructive notice argument here. Dkt. 85 at 12. The question is whether Plaintiff provided any evidence showing that UP 5683 had a defect or hazard that Union Pacific should have been aware of and could have discovered upon the exercise of due care. Plaintiff has not satisfied this burden because, like the unsuccessful plaintiff in *Holbrook*, he introduced no evidence that the oily substance was on UP 5683's walkway before his alleged accident and "there are a myriad of possible ways" it could have gotten onto the walkway even if an inspection was required and performed. 414 F.3d at 744-45. While the district court found concerning the fact that Plaintiff wore his work boots around his farm, which suggested the oily substance may have been tracked onto UP 5683 by Plaintiff, its decision did not turn on that fact; it was just another of the myriad possible ways the substance could have landed on the walkway. Dkt. 85 at 12.

Plaintiff attempts to distinguish *Holbrook* because the rail car at issue there was inspected prior to the plaintiff's accident and here "UP failed to conduct mandatory inspections." Pl.'s Br. 32. As discussed above, that is not the case, and

even if it were, Plaintiff's claim, as the district court found, "still would rest 'on mere speculation and conjecture' that an inspection would have turned up something." Dkt. 85 at 12-13.

Given that Plaintiff admitted he could not see the oily substance before his fall despite the fact that he was using a flashlight to illuminate his path and he was on the lookout for hazards (Dkt. 49-1 at 24-26), his admission that the oily substance was not immediately visible until he leaned closely over it with a light (*id.* at 29-30), and the uncontested fact that there were no nearby locomotive components that could have leaked and caused a spill (Dkt. 49-5 at 11), his argument that it would have been discovered in a prior inspection is just as tenuous as the argument made and rejected by this Court in *Holbrook*. Because Plaintiff's constructive notice argument "'rests on mere speculation and conjecture,' it too must fail." *Holbrook*, 414 F.3d at 745 (quoting *Deans*, 152 F.3d 330).

    **C.**    **Plaintiff presented no evidence from which a jury could reasonably conclude that the tread on UP 5683's walkway was dangerously worn at the time of his alleged accident, much less evidence that Union Pacific had notice of dangerously worn tread.**

Plaintiff further argues that even if his other theories of liability fail, the district court erred by not distinguishing between his claim that Union Pacific was negligent because there was oil on the walkway and his claim that Union Pacific was negligent because the walkway's tread was dangerously worn, the latter of which he says was supported by evidence. Pl.'s Br. 34. Plaintiff's argument on this point does not match his evidence; indeed, it is undermined by his own testimony.

While Plaintiff pleaded that the walkway on UP 5683 was worn and provided insufficient footing (Dkt. 22 at 2), he explained the true nature of his claim at his deposition, testifying as follows:

> Q:     Mr. Ledure, it sounds like it is your belief that the reason that you fell on August 12 of 2016, was because you slipped on a slippery substance that was on the platform of the Union Pacific locomotive, is that correct?
>
> A:     That's correct.
>
> Q:     Is there any other explanation that you have in mind, as to what caused you to fall?
>
> A:     I believe that if there would have been better footing traction on the walkway, *it could have stopped me from slipping on that*. The walkway was – the paint was wore off of it, the little studs that was supposed to be sticking up were flat. And on most all other locomotives, the walkways are more of a diamond-type plate that has a type of paint with sand and some sort of non-slip substance in it that they paint on there that keeps your feet from slipping. I think that would have definitely helped.

Dkt. 49-1 at 44 (emphasis added). The "that" Plaintiff referred to in his answer was the oily substance on UP 5683's walkway.

Plaintiff's testimony makes plain that he does not contend the worn tread alone caused his fall and in the absence of the oily substance he would have slipped and fallen on UP 5683. His negligence theory therefore depends on the presence of the oily substance on the walkway prior to his fall. Because of that, and because he failed to introduce facts showing that the presence of that oily substance was foreseeable, his dependent tread theory necessarily fails along with his primary theory.

Plaintiff's belief that a different tread design would have provided better footing also contradicts his argument here that he "does not contend that UP 5683

should have been *designed* with a different walkway tread pattern." Pl.'s Br. 35 (emphasis original). This is relevant because his claim that Union Pacific, or rather the locomotive manufacturer, should have installed a different tread is precluded and preempted by the LIA, which has long been understood to occupy the entire field of locomotive design issues. *Napier v. Atlantic Coast Line R. Co. Chicago & N.W. R. Co.*, 272 U.S. 605, 613 (1926); *Kurns v. R.R. Friction Prod. Corp.*, 565 U.S. 625, 631-32, 634 (2012). Unless Plaintiff introduces evidence that the stud tread used on UP 5683 violated LIA safety standards, his design-related claim fails as a matter of law.

Finally, even if Plaintiff's worn tread theory did not depend on the presence of the oily substance on the walkway prior to his alleged fall, his bare allegation that different tread created an unsafe workplace or would have prevented his injury is insufficient to create a triable issue. This Court rejected a similar claim brought by an injured worker in *Deutsche v. Burlington Northern Railroad Company*, 983 F.2d 741 (7th Cir. 1992), where the plaintiff alleged he slipped off a locomotive ladder and claimed the railroad was negligent in failing to provide non-skid surfacing on the ladder's rungs. The district court entered summary judgment for the railroad and this Court affirmed, finding in relevant part that the plaintiff "presented no evidence regarding the lack of nor the necessity for non-skid metal surfaced ladder rungs," and thus failed to demonstrate the presence of a genuine issue of material fact concerning the railroad's alleged negligence. *Id.* at 744. In other words, the plaintiff failed to put forward any evidence beyond his bare allegation that the presence of different tread would have resulted in a different outcome.

Plaintiff here likewise failed to present evidence that alternative tread on the walkway of UP 5683 would have prevented his alleged fall. Aside from his bare allegation that he thought a diamond-pattern grip or sanded paint would have provided better traction than the stud pattern grip on the locomotive's walkway, Plaintiff submitted only photographs (taken years after his alleged fall (Dkt. 87 at 72)) showing that some of the tread on the walkway was to his eye worn. Plaintiff did not submit any evidence, such as an expert opinion, beyond his own speculation connecting the tread's pattern or condition to the cause of his alleged fall. His claim, in other words, was based entirely on his own speculation. The same result reached in *Deutsch* is thus appropriate here as well.

### D.     Plaintiff's allegations of LIA regulatory violations fail with his FELA claim.

Plaintiff finally argues that the district court erred in entering summary judgment for Union Pacific on those parts of his FELA claim that depend on claimed LIA regulatory violations. Pl.'s Br. 36. He argues that the district court was wrong to find those allegations moot because of its finding that UP 5683 was not "in use" and the LIA therefore did not apply. *Id.* Conspicuously absent from Plaintiff's argument is citation to any authority stating that the violation of the LIA or a regulation promulgated by the United States Department of Transportation thereunder may be used to establish a railroad's negligence where, as here, the LIA does not apply. Plaintiff references only cases in which regulations promulgated by the Occupational Safety and Health Administration were found relevant in FELA actions. *Id.*

Regardless, this argument is a non-starter. If this Court agrees with the district court that Plaintiff failed to introduce evidence from which a trier of fact could reasonably conclude that his injury was foreseeable, the fact that Union Pacific may have somehow violated these regulations is irrelevant. This is what the district court appears to have meant when it said that Plaintiff's LIA regulatory claims were "moot." Dkt. 85 at 13. Even if those regulations are relevant in establishing Union Pacific's standard of care, the fact that Plaintiff cannot satisfy the foreseeability element of his negligence claim is dispositive of his claim.

Were an alleged LIA regulatory violation sufficient to establish foreseeability where a locomotive is not "in use," then there would in practice be no difference between the FELA and LIA, as the latter would swallow the former, rendering railroads subject to the negligence *per se* standard in nearly all locomotive-related FELA actions. This would essentially make the FELA a workers' compensation or strict liability statute when this Court has made clear that the "FELA is not a strict liability statute." *Fulk v. Ill. Cent. R.R. Co.*, 22 F.3d 120, 124 (7th Cir. 1994); *accord Doty v. Ill. Cent. R.R. Co.*, 162 F.3d 460, 463 (7th Cir. 1998).

## CONCLUSION

WHEREFORE, and for the reasons stated above, Defendant-Appellee Union Pacific Railroad Company respectfully requests that the Court affirm the district court's summary judgment order and denial of Plaintiff's Rule 59(e) motion, and grant any other relief the Court deems appropriate.

Dated: November 20, 2019

Respectfully submitted,

UNION PACIFIC RAILROAD
COMPANY, Defendant-Appellee,

By:    */s/ J. Timothy Eaton*
       One of Its Attorneys

J. Timothy Eaton
Jonathan B. Amarilio
TAFT STETTINIUS & HOLLISTER LLP
111 E. Wacker Drive, Suite 2800
Chicago, Illinois 60601
Tel.: 312.527.4000
teaton@taftlaw.com
jamarilio@taftlaw.com

Thomas E. Jones
Thompson Coburn LLP
525 W. Main Street, Suite 300
Belleville, Illinois 62220
Tel.: 618.227.4700
tjones@thompsoncoburn.com

*Attorneys for Defendant-Appellee*

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Defendant-Appellee, Union Pacific Railroad Company, certifies that the foregoing brief:

(i)     Complies with the type volume limitation of F.R.A.P. 32(a)(7)(B)(i) and C.R. 32(c) because it contains 14,000 words including footnotes and excluding the parts of the brief exempted by F.R.A.P. 32(f).

(ii)     Complies with the typeface requirements of F.R.A.P. 32(a)(5), the type style requirement of F.R.A.P. 32(a)(6), and the type size requirement of Cir. R. 32(b).

Dated: November 20, 2019

/s/  *J. Timothy Eaton*

## CERTIFICATE OF SERVICE

I hereby certify that on November 20, 2019, I electronically filed the foregoing with the Clerk for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.  I certify that Counsel of Record for Defendant-Appellee is a registered CM/ECF user and that service will be accomplished by the CM/ECF system.


/s/  *J. Timothy Eaton*